UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

**IN RE NATIONAL LEGAL**
**PROFESSIONAL ASSOCIATES (NLPA)**          **1:08-MC-101 (NAM/DRH)**

◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

APPEARANCES:

Kindlon Shanks & Associates
Terence L. Kindlon, Esq., of counsel
74 Chapel Street
Albany, New York 12207
and
Robinson & Brandt, P.S.C.
Jeffrey M. Brandt, Esq., of counsel
Suite B
629 Main Street
Covington, Kentucky 41011
Attorneys for NLPA

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

Presently before the Court is United States Magistrate Judge David R. Homer's Report

and Recommendation (Dkt. No. 21) concerning the activities of National Legal Professional

Associates ("NLPA") in connection with the criminal prosecutions of Cash Whitmore and King

S. Burden in *United States v. Whitmore*, Case No. 1:08-CR-385, in this district.  Magistrate Judge

Homer concludes that these activities did not constitute practicing law and recommends that no

order be issued enjoining NLPA from the unauthorized practice of law in this district or

compelling NLPA to refund any fees paid by the families of Whitmore and Burden.  Not

surprisingly, NLPA has interposed no objection.  Upon review of the matter, the Court concludes

that NLPA engaged in the unauthorized practice of law in connection with these two defendants.

Accordingly, the Court issues an order enjoining NLPA and all individuals associated therewith

from engaging in the unauthorized practice of law in the Northern District of New York and

directing the return of the fees paid by the families of Cash Whitmore and King S. Burden,

defendants in *United States v. Whitmore*, Case No. 1:08-CR-385.

Also pending is NLPA's motion (Dkt. No. 7) to unseal transcripts of the September 29,

2008 and November 7, 2008 hearings. The redacted transcripts have been filed in the context of

the criminal proceedings (1:08-CR-385, Dkt. Nos. 49, 50), and the motion is denied as moot.

**BACKGROUND**

Magistrate Judge Homer's Report and Recommendation sets forth the background of the

matter. Very briefly, the matter stems from the requests for appointment of new counsel made by

two defendants, Cash Whitmore and King S. Burden ("defendants"), both charged in the same

criminal complaint with conspiracy to distribute cocaine base (Case No. 1:08-CR-385, Dkt. No.

1).[1]  Magistrate Judge Homer held hearings regarding the requests (*id*., Dkt. Nos. 49, 50), and

learned in both cases that the defendants' families had contracted to receive services from NLPA

and that NLPA had mailed materials to defendants.

At the September 29, 2008 hearing regarding Cash Whitmore's request for appointment of

new counsel in place of Timothy Austin, Esq., Assistant Federal Public Defender, the following

colloquy took place between Whitmore and Magistrate Judge Homer:[2]

> THE DEFENDANT: Been doing my legal studies in the library and my
> mother also hired like a legal team, but they can't represent me though.

---

[1] The criminal complaint, filed June 27, 2008, charged that Whitmore, Burden, and two others "did knowingly and intentionally combine, conspire, confederate and agree with one or more persons to distribute and possess with intent to distribute more than 50 grams of cocaine base" in violation of 21 U.S.C. §§ 841(a)(1); (b)(1)(A), and 846.

[2] Throughout this Memorandum-Decision and Order, the Court quotes directly from the record without noting or correcting errors in the original.

Information I got from the law library and legal team just don't add up to what Mr. Austin (inaudible)...

THE COURT: When you say a legal team, are you talking about lawyers?

THE DEFENDANT: It's like a team of lawyers, but they can't represent you. Something called NLPA. National Legal Professional Associates.

THE COURT: Is this a service that your mother has paid for?

THE DEFENDANT: Yes. Right now (inaudible)

THE COURT: All-right. So have you received some advice through your mother from this legal team?

THE DEFENDANT: The legal team themself sent me package, legal stuff to read, and I believe they call the law library in jail, and I feel a few helpful things from books that I'm reading, packages that they sent me, and um...

THE COURT: Can you give me an example?

THE DEFENDANT: Might be – not off the top. I'm trying to think of (inaudible) . Might be talking about on the rap sheet, how to beat your client's rap sheet. I really – I can't pinpoint things right now. (inaudible) Legal material with me though. How to beat your client rap sheet. And Mr. Austin, he might say something different, the papers might tell me something different right now, things of that nature.

*** [Redacted]

THE COURT: And that this legal team is recommending that you go to trial and seek a verdict of not guilty, is that correct?

THE DEFENDANT: No. They not allowed to give you that type of advice; go to trial or take a plea; they not allowed to give that type of advice. If I ask them – if I go to the law library and find information out, they'll send me further information about the law.

***

THE DEFENDANT: I feel there's a mistake on my – I feel a mistake on my rap sheet that say I have two felony when I should have one. Things I'm reading from the law library and NLPA also saying things that I feel, Mr. Austin is saying that this is the reason why.

***

THE COURT: All right. Mr. Whitmore, Mr. Austin  said that there might be some other reasons why you would seek new counsel. Was there anything you wanted to tell me?

THE DEFENDANT: [Redacted.] To my knowledge I don't understand why don't want to work with somebody to make their job a little easier. [Redacted.] I didn't feel like he was working real in a timely fashion, I guess you could say. I ask him –

THE COURT: Well, what do you know about NLPA? This is the first I've ever heard of their existence.

THE DEFENDANT: There's a few people in Albany jail who have them. And they also send me a – I guess like a report of cases they won and

people they help out, like things of that nature.
THE COURT: Do you know if they're lawyers?
THE DEFENDANT: They have their own senior lawyers but they use like
a – I don't know how to pronounce it. They work as your lawyer but like
they – I'm not sure Mr. Austin got in contact with them, but they was able
to work aside of him. (inaudible) I know put aside working, finding out
things, he ain't one to do that. So basically they work with me and my
family. But they have also their own lawyers that I have to hire myself.
***
THE COURT: ... [Y]ou probably haven't talked to any of them, have you?
THE DEFENDANT: Yes.
THE COURT: You have talked to them?
THE DEFENDANT: Yeah.

At King S. Burden's November 7, 2008 hearing regarding whether he should be given

new counsel to replace his assigned lawyer, James E. Long, Esq., the transcript includes the

following:

THE COURT: What's the National Legal Professional whatever it is?
THE DEFENDANT: They just some people that my mom had paid to work
with my lawyer.  It's a group of lawyers and associates that sent me all
kind of paperwork and stuff and just make sure my lawyer is doing his job.
THE COURT: What's the paperwork?
THE DEFENDANT: Different kind of packets and motions that I could put
in and, um, basically regular legal documents that I could go to the law
library and find out myself.
THE COURT: Do they – did they advise you as to what the contents of
your Plea Agreement would look like?
THE DEFENDANT: No, your Honor.
THE COURT: Did they tell you what you should ask for?
THE DEFENDANT: No, your Honor. Said it's up to the Judge's
discretion.  It's under the Judge's discretion.
THE COURT: Did they give you legal advice?
THE DEFENDANT: Yes.
(Pause ...)
THE DEFENDANT: Nothing nothing really concerning my case just, um
what kind of motion I could file or – basically I asked them a question, and
then they send me that package from what I asked them cuz I can't call my
lawyer so I can't call him and ask him.  I called the National Legal
Professional and they – I asked them a question that I would have asked my
lawyer if I was able to contact him over the phone.

On November 12, 2008, the Court referred the matters to Magistrate Judge Homer for further proceedings as necessary regarding the possible unauthorized practice of law by NLPA (Dkt. No. 1).  On November 17, 2008, Magistrate Judge Homer issued an Order to Show Cause (Dkt. No. 2) directing NLPA to show cause why an order should not be entered enjoining NLPA and any individuals associated therewith from engaging in the unauthorized practice of law in the Northern District of New York and directing the return of the fees paid by defendants' families. NLPA moved (Dkt. No. 19) to cancel the hearing scheduled for February 12, 2009 and to proceed solely on submitted papers, contending that NLPA's submissions "conclusively demonstrate[] that NLPA has not engaged in the unauthorized practice of law" and that "NLPA has no additional evidence to present at a hearing on the order to show cause."  By order dated February 9, 2009 (Dkt. No. 20), Magistrate Judge Homer granted the motion to cancel the hearing, adding that "if it is determined following a review of NLPA's submissions that either questions of fact are presented necessitating an evidentiary hearing or that oral argument is desired, a further hearing will be scheduled."  No further hearing was scheduled and Magistrate Judge Homer issued the Report and Recommendation (Dkt. No. 21) based on NLPA's submissions.  Inasmuch as NLPA waived any hearing and submitted the matter for decision on the record, and there are no credibility determinations and no basis to hold further proceedings, the Court decides the issue as a matter of law based on NLPA's undisputed submissions.

NLPA's submissions include copies of the materials NLPA mailed to defendants.  In these materials, NLPA stated that it provides two levels of services to criminal defendants: Preliminary Pretrial Services ("PPS") (sometimes referred to in NLPA's publications as PPT, Preliminary Pretrial Consultation, or PPC) and Full Pretrial Services ("FPS") (sometimes referred to in

NLPA's publications as FPT).  Both defendants' cases here involved only the first level of service, PPS.  As explained below, the Court finds that NLPA's activities at the PPS level in defendants' cases constituted giving legal advice, and, therefore, the unauthorized practice of law.

Among the inherent powers incidental to all courts is the power to regulate and discipline attorneys who appear before it.  *See Chambers v. NASCO, Inc*., 501 U.S. 32, 43 (1991).  Such power extends to enjoining and sanctioning the unauthorized practice of law.  *See United States v. Johnson*, 327 F.3d 554, 560 (7th Cir. 2003).  In the exercise of its inherent powers, this Court holds that NLPA engaged in the unauthorized practice of law in its relationship with Whitmore and Burden in *United States v. Whitmore*, Case No. 1:08-CR-385; rejects the Report and Recommendation as contrary to law; issues an injunction prohibiting NLPA from engaging in the unauthorized practice of law in the Northern District; and directs NLPA to refund the monies received for its services to Whitmore and Burden.

## FACTS

**Cash Whitmore**

*July 7, 2008 mailing*

The affidavit of H. Wesley Robinson, Director of Client Services for NLPA, states:

> Defendant Cash Whitmore contacted NLPA by telephone on July 7, 2008.
> He advised that he was facing a federal conspiracy case and that he was
> interested in having any assistance that NLPA's attorneys could provide to
> his lawyer.  He provided his family's contact information and asked that
> NLPA send him and his family information about the assistance which
> could be provided.  Accordingly, NLPA sent to Mr. Whitmore and his
> mother a letter explaining the services that could be provided by NLPA.

The July 7, 2008 letter NLPA sent to Whitmore explained the two levels of service as follows:

For the past two decades, NLPA's attorneys have provided consulting and research assistance to thousands of lawyers throughout the United States in preparing for the defense of a case at trial.  NLPA does not replace your attorney but rather adds to the defense team to assist your counsel in your case. We have two different levels of assistance that we can provide to you:
- Preliminary Pre-trial Consultation (PPT)
- Full Pre-trial Services (FPT)

Each of these levels of services is outlined in the enclosed information. The first level, which we call "Preliminary Pre-Trial Consultation" only costs $2,500.00. This is a nonrefundable fee. This Preliminary Pre-trial Consultation involves NLPA helping to keep you and your family advised as to what is happening in your case and liaison with you and your family on many very important aspects of your defense. As your attorney is busy researching, drafting, and preparing your case, NLPA can serve a supporting role to enhance communication. Please review the enclosed information so you can get a clearer understanding as to the important assistance this level of service can provide to you and your family.

Once we are retained for the PPC, we will contact retained counsel. If you have appointed counsel we must wait to receive communication from your attorney that he or she is willing to accept our attorney's assistance. We will explain to your counsel how NLPA's attorneys can assist the defense team as you prepare for trial. If your counsel agrees to include NLPA in the legal arm of your defense team, then your family can pay the remaining balance of our total $4,950.00 pre-trial research fee. We will then shift the focus of our assistance to the research and consulting that will directly impact your pre-trial process. This assistance, as outlined below, would include the drafting of pretrial motions that are case specific to your circumstance, legal research addressing defenses you may have, consulting with counsel as to the investigation of the defense, and the like.

Of course, if you already know that counsel is willing to have NLPA assist in your defense as a consultant, we can move quickly to this second stage based upon a $4,950.00 research fee.

Enclosed with the July 7, 2008 letter was a six-page "Newsletter" from NLPA dated Summer 2008, headed, "Pre-trial and the Need for a Strong Defense Team."  The first paragraph stated:

Michael Jackson, Robert Blake, and O.J. Simpson aren't the only people who can benefit from the team approach in a criminal case. You can too and it costs less than you may think. National Legal Professional

Associates (NLPA) is a technical legal research and consulting firm, owned by attorneys, and dedicated to the professional mission of providing consultation, research, and related work product to members of the Bar. Although our attorney research department stands ready to assist in all phases of pre-trial management, our expertise extends from pre-trial assistance, to sentencing, appeals and all types of post conviction relief litigation. Our research is prepared by licensed attorneys.

In describing the PPS level of service, the Newsletter stated in part:

Examples of the services that NLPA can provide to you and your family, should you retain us for this level of assistance, are as follows:

a.    We will provide you and your family with information concerning exactly what is happening in the case. This will include following up with the court to advise you of what pre-trial motions have been filed, responses filed by the government, and the status of the case in general. In this way, by having NLPA involved, we can assist you in getting a clearer understanding of exactly what is happening with the case. This will assist you in communicating with your attorney as to what you want him to do in defending your case.

b.    We will assist you and your family in getting copies of court documents.

c.    If available, we will provide to you with a copy of the Docket Sheet from the court. In this way, you will know exactly what the status of the case is according to the Clerk of Courts records. This will include advising you of approaching deadlines, motions filed by defense counsel or the prosecutor, and any court rulings that have been made on those motions.

\*\*\*

i.    We will provide you and your family with general information that will be extremely helpful to you in understanding the criminal process and how your case will be handled by your attorney and the court. This information can be of benefit to you in explaining to your lawyer what you expect of him and what you want him to do on your behalf in the defense of the charges pending against you.

\*\*\*

The Newsletter next addressed the FPS level, stating: "[S]hould your attorney be willing to have our lawyers assist him in the actual research and preparation of pretrial motions as well as work with him on the strategy to pursue in your defense, NLPA is happy to provide this additional

-8-

service."[3]  The Newsletter added:

> Unfortunately, we have run into situations where an attorney for some
> reason does not believe in the team approach, does not want any help, or
> for some other reason declines to work with NLPA. In these rare instances,
> the Bar Association does not permit NLPA to provide any legal research.
> Therefore, if you want our assistance and either you are currently not
> represented by counsel or your attorney declines to work with NLPA, you
> will need to engage an attorney who values NLPA's services. Otherwise,
> we are limited to the preliminary pretrial consultation assistance but will
> not be able to prepare pre-trial motions for your attorney.

Regarding fees, the Newsletter stated that NLPA is "aware that not everyone can afford to

pay our research fee in one lump sum" and offered various methods of payment including a

payment plan, credit card payments, Telecheck, cashier's check, and money order.[4]  It also

included a loan application form from "Lenders Financial Group, Inc."  The fees section added:

> I hope that this newsletter has given you a better understanding of the
> assistance we are in a position to provide your counsel at this most
> important time. I know that at this point you are extremely apprehensive
> about your approaching trial, and I would urge you to consider taking every
> possible action to help ensure that you have the best defense team available
> to you.

Also enclosed with the July 7, 2008 letter was a "File Report" form for Whitmore to fill

out.  The form requested information regarding defendant's present offense (including a

"statement of events"); asked defendant to state whether he believes the court relied upon

erroneous information in pronouncing his sentence and, if so, to attach a memo "outlining

erroneous information which needs to be corrected"; asked whether he reviewed his PSI ten days

---

[3] In describing the FPS stage, the Summer 2008 NLPA "Newsletter"headed, "Pre-trial and the
Need for a Strong Defense Team" listed eight "potential pre-trial motions," all of which are either
unnecessary in the Northern District, see N.D.N.Y. Local Rules of Criminal Procedure 14, or routine.

[4] Although the July 7, 2008 letter referred to a PPS fee of $2,500 and an additional FPS fee of
$2,450, for a total of $4,950, the Newsletter referred to a PPS fee of $2,750 and an additional FPS fee of
$2,500 for a total of $5,250.

or more before his sentencing; asked whether he filed a post conviction motion, and, if so, its

status; and requested defendant to list all prior convictions, including the charge, the sentencing

court, its location, the sentence received, the start and end date of the sentence, and parole status.

The File Report further stated:

> Listed below are documents that would be of help to NLPA in reviewing
> your case for your counsel. Please circle items that you are enclosing for
> our review:
> 1) Judgement and Commitment Order (can be obtained from case
> manager).
> 2) Pre-sentence Investigation Report (can be obtained from your case
> manager).
> 3) Plea or trial and sentencing hearing transcripts.
> 4) Copy of plea agreement (if appropriate)
> 5) Copy of indictment (or information).
> 6) Your Case Docket Sheet
> 7) A letter from you explaining about issues in your case that you want us
> to be aware of.
> 8) Copies of any motions that you or your counsel have filed and Court
> Decision concerning them.
> 9) Any appeal documentation that you have available.
> 10) Any court decisions issued in your case.

Also enclosed with the July 7, 2008 newsletter were documents concerning payment of NLPA's

fee, including a loan application and a credit card authorization form, and forms for the "NLPA

Referral Program" in which a defendant's outstanding balance is credited 10% of all fees paid by

anyone referred by defendant who "hire[s] [NLPA's] attorneys to assist them with their case."

Also enclosed was an undated two-page "Special Bulletin" by NLPA headed, "Our History: The

Heritage of NLPA – The Fight for Justice"; an advertisement for a book, "Surviving Jail," for

$79.95; and a one-page memorandum dated June 2, 2008 from NLPA to "Interested Counsel and

Their Clients," headed "Victory List," stating: "The following is a list of just some of the cases in

which NLPA has provided research and assistance to counsel as a member of the *Defense Team*.

With the help of NLPA's experienced team of investigators, paralegals, and attorneys, the cases listed below all resulted in a <u>victory</u> for the defendant." (Emphasis in original.)  Attached to the memorandum was a 14-page list of over 200 cases, mostly federal, with index numbers ranging from 1990 to the late 2000's.

> *July 23, 2008 mailing*

On July 16, 2008, Whitmore's mother Beatrice Whitmore signed an "Agreement for Services" agreeing to pay NLPA's non-refundable PPS fee of $2,500, and made a "down payment" of $1,000.[5]  Robinson states in his affidavit that on July 23, 2008, he telephoned the Public Defender's Office "to offer research assistance from NLPA to Mr. Whitmore's counsel, Mr. Austin"; that he was told that Austin was out of the office until July 30, 2008 and would return his call then; and that Austin never returned the call.  Also on July 23, 2008, NLPA sent Whitmore a letter which includes the following:

> I am writing to advise you that I have assigned Mark Konerman to be your Case Manager here at NLPA. I would like to take a moment to explain to you and your family about the Case Manager's responsibilities and the process by which NLPA will be working with you.
>
> Your Case Manager will:
> • Handle the administrative details of your case, both in terms of financial matters as well as updates with regard to your case.
> • Be your main contact at NLPA, acting as a connection between you, as the client, and the NLPA's research staff.
> • Follow up with your counsel should he desire to have NLPA work on the defense team with him.
>
> As you may be aware, NLPA employs a significant number of case analysts on our research staff who prepare the actual research on any given case. The case analysts' time is dedicated to working on your file, and others, and are generally too involved with research and drafting to take

---

[5] Robinson states that Beatrice Whitmore later paid an additional $100 for a total payment of $1,100.

telephone calls on a timely basis. Therefore it is necessary to have someone who can coordinate matters and be able to speak with you in order to give you the most recent updates regarding your case. That is the role of your case manager.

This role is even more important at this critical juncture in your proceedings. As we have discussed with you, NLPA has two different levels of assistance that we can provide to you as you proceed toward resolution of your indictment: Preliminary Pre-trial Consultation (PPC) and Full Pre-trial Services (FPS). Preliminary Pre-Trial Consultation involves NLPA helping to keep you and your family advised as to what is happening in your case and liaisoning with you and your family on many very important aspects of your defense. This type of liaison is performed by your case manager, who also serves an important supporting role to enhance communication with all parties.

\*\*\*

It is important that you and your family keep in mind that we can only assist with your case to the extent that we receive funds from your family. Therefore, in order to continue our assistance without interruption it is critical that your family send payments to us as often as possible until the fee is paid in full.  As you can see from the enclosed note from our Finance Department, you will need to have your family contact our office to develop a payment plan which meets both the upcoming deadlines on this matter and your family's financial abilities.

\*\*\*

As you know, you have elected to pay NLPA's research fee in payments. Please keep in mind that under this plan, our lawyers can only prepare research to the extent the funds sent to us will permit.  Therefore, you control how quickly the research is completed based upon the payments you send us.  In this regard, it is important for you to be aware that there **may be filing deadlines** associated with your case.  Accordingly, we will endeavor to advise you of any deadline that may apply as soon as we have received the necessary documentation and funds from you to make such a determination.  In this way, should a deadline be rapidly approaching, we will be able to advise you and then you can adjust your payment schedule accordingly if it is necessary.

(Emphasis in original.)  The letter acknowledged receiving from Whitmore copies of the docket sheet, criminal complaint, order of detention pending trial, and the indictment, and stated: "In order for us to properly assist you, we need to also receive from you the following documents: Preliminary Hearing Transcripts; Discovery/Investigation Reports; Any pretrial motions/petitions

-12-

you may have filed." Again NLPA enclosed the financing documents and the advertisement for "Survive Jail," as well as a publicly-available docket sheet for Whitmore's case printed from the Northern District's website.

*July 31, 2008 mailing*

According to Robinson's affidavit, on July 31, 2008, Whitmore contacted NLPA "asking if it could assist with his plea negotiations" and requesting "information about mandatory minimum sentences and challenging criminal history categories." Robinson states that "NLPA advised Mr. Whitmore that since his lawyer had not agreed to accept NLPA's research and consulting assistance that no case-specific research could be provided."[6]

The materials NLPA sent Whitmore on July 31, 2008, listed below, were accompanied by the following letter, set forth in its entirety:

> Dear Cash,
>
> I am writing to touch base with you on the status of your case. Enclosed with this letter is a partial docket that reflects the court's most recent entries.
>
> As you know, you have communicated with our office that you cannot decide whether to enter a plea in your case or take your case to trial.
>
> We wanted to take this opportunity to send you some information that may be of assistance to you concerning plea negotiations. Once you have reviewed this material, if you have any questions, please contact your attorney to discuss the specific of any plea that you may be considering.
>
> We hope that this information is of help to you. We will be back in touch again soon and are looking forward to assisting you in this most important

_____

[6] Robinson's affidavit states that with its July 31, 2008 letter, NLPA sent Whitmore a press release concerning the passage of the Crime Bill and an article entitled "Challenging Your Client's Criminal History Category" written and published by Assistant Federal Public Defenders Andrea George and Katherine Menendez of the District of Minnesota. According to the record submitted to Magistrate Judge Homer, however, these materials were sent to Whitmore on August 27, 2008, not on July 31, 2008.

matter.

> **"Knowledge is power.  Let NLPA's attorneys help keep you and your family up to date on what is happening in your case."**

Sincerely yours,

Mark E. Konerman
NLPA Case Manager

(Emphasis in original.)  According to the record submitted to Magistrate Judge Homer, the following were enclosed with the letter: a publicly-available docket sheet printed from the Northern District website[7]; a 79-page article, "Making a Deal with the Devil - Plea Agreements Under the Federal Rules, Federal Sentencing Guidelines, and Department of Justice Policies," by David Taylor Shannon, Chief Assistant Federal Public Defender, Tucson, Arizona, dated 1999; a 14-page article, "Plea and Sentencing Practices and Issues Outline," by Delonia A. Watson, Assistant United States Attorney for the Northern District of Texas, updated November 12, 2003; an undated two-page "Memorandum" from NLPA to "All Interested Counsel" regarding "Techniques for Enforcing Stipulations in Plea Agreements at Sentencing – Another NLPA Victory!" citing to "*U.S. v. Cantrell* (U.S.D.C.N. Dist. of Ohio, No 5:97 CB 0312, June 1998)" accompanied by a two-page Magistrate Judge Report and Recommendation in the case, filed June 5, 1998; an undated two-page "Memorandum" from NLPA to "All Interested Counsel and Their Clients" regarding "Remedies Available to Defendants Who Have Waived Their Appellate or § 2255 Post Conviction Rights in a Plea Agreement"; a 24-page article, "An Introduction to Federal Sentencing," by Henry J. Bemporad, Office of the Federal Public Defender, Western District of Texas, dated March 2008; eight pages of sentencing guideline calculation worksheets by the

---

[7] This docket sheet, dated November 26, 2008, post-dates the July 31, 2008, letter and thus cannot be a correct copy of the docket sheet that was enclosed with the letter.

-14-

Federal Sentencing Commission dated February 12, 2008; a one-page Sentencing Table dated November 1, 2007; and an undated two-page "Memorandum" from NLPA to "All Interested Counsel and Their Clients" regarding "How to Avoid the Use of Dismissed Charges from an Indictment in Determining Your Client's Sentence."

*August 27, 2008 mailing*

Robinson's affidavit states that on August 14, 2008, NLPA received a telephone call from Whitmore advising that his attorney refused to work with the lawyers at NLPA.  Robinson states: "Accordingly, NLPA advised Mr. Whitmore that without his attorney's willingness to receive NLPA's help, NLPA could not prepare any case specific research for the case" but rather "could only provide him with generic information about cases of his type as well as copies of the docket sheet [and] other public information available from the court records."

On August 27, 2008, Konerman wrote Whitmore the following letter, set forth in full:

> Dear Cash,
>
> We are writing to follow-up with you and provide you some additional information concerning your case. We are enclosing a partial docket with the most recent issues.
>
> In recent communications, you indicated that you may be considering entering into plea negotiations and are concerned about your prior criminal history and how it may impact your current offense. We are enclosing some information that you may find of interest.  Please review these carefully. Should you have specific questions, you should discuss them with your attorney.
>
> We hope that this information is of help to you. We will be back in touch again soon and are looking forward to assisting you in this most important matter.
>
> **"Knowledge is power. Let NLPA's attorneys help keep you and your family up to date on what is happening in your case."**

-15-

Sincerely yours,

Mark E. Konerman
NLPA Case Manager

(Emphasis in original.)  According to the record submitted to Magistrate Judge Homer, the following were enclosed with the letter: an excerpted publicly-available docket sheet printed from the Northern District website[8]; two copies of a two-page "Memorandum" from NLPA dated May 20, 2002 to "All Interested Counsel and Their Clients" regarding "Sentencing – Maximizing the Benefits of the Plea Agreement" discussing a case, *United States v. Johnson*, with no citation or other identifying information; two copies of an undated one-page "Memorandum" from NLPA to "All Interested Counsel," headed "Mandatory Base Offense Levels for Firearm Offenses," discussing *United States v. Horne*, a Pennsylvania District Court case; two copies of a letter to Robinson from Charles A. Murray dated May 3, 2002, thanking NLPA for its help with the sentencing issues in *United States v. Horne*; two copies of an undated two-page "Memorandum" from NLPA to "All Interested Counsel and Their Clients" regarding "Career Offender Status of Inmates" discussing a "recent" 1993 United States Supreme Court decision, *Stinson v. United States*, 508 U.S. 36 (1993); a 21-page article, "Beating the Rap (Sheet): Fighting Sentencing Enhancements Based on Prior Convictions," by Brent E. Newton and Timothy W. Crooks, Assistant Federal Public Defenders for the Southern District of Texas, dated July 2004; and a 12-page article, "Challenging Your Client's Criminal History Category," by Andrea K. George and Katherine M. Menendez, Assistant Federal Defenders, District of Minnesota, dated March 2003.

The above-listed 2004 article, "Beating the Rap (Sheet): Fighting Sentencing

---

[8] This docket sheet, dated December 1, 2008, post-dates the August 27, 2008, letter and thus cannot be a correct copy of the docket sheet that was enclosed with the letter.

Enhancements Based on Prior Convictions," by two assistant federal public defenders, made

recommendations to defense counsel, such as: "Keep preserving your objections that, <u>where prior

convictions raise the statutory maximum sentence, they must be treated as elements</u>." (Emphasis

in original.)

### Subsequent contacts

According to the record, NLPA sent a nine-page NLPA "Newsletter" to Whitmore on

September 11, 2008, the first page of which is dated March 2008 (the following pages are dated

January 2008), headed: "Great News for Crack Case Defendants and Their Families: New

Sentencing Guidelines Go into Effect.  BOP Projects 20,000 Defendants Eligible for Early

Release!"  This newsletter discusses a number of aspects of *Kimbrough v. United States* 552 U.S.

85 (2007), including its potential effect on inmates in various situations such as career offenders

and defendants whose guideline range was not affected, and states: "For these reasons, we are

advising many inmates (especially those who were sentenced under the mandatory Guidelines

years ago) to strongly consider taking action under § 3582(c)(2)."  The newsletter then suggests

the relief such inmates could request.  The newsletter continues:

> **False Rumor: Everyone Gets a Court-appointed Attorney**. Wrong!
> Many Inmates will be eligible for court-appointed attorneys. For inmates
> without any supporters or financial sources, this may help guarantee a
> minimal level of representation.  However, inmates will not have their
> choice of counsel and will have to hope for the best with the attorney
> assigned to them by the government. Some court-appointed attorneys
> apparently believe that much fewer defendants are eligible for relief than
> should file. That means that court-appointed attorneys may not take action
> in your case or other cases in which a § 3582 motion should be filed. We
> have already seen that some court-appointed attorneys have decided that
> they will move only for a two-level reduction (not a sentence below the
> Guidelines range that we are pushing for), and file what amounts to form
> motions requesting the two level reduction. Our advice is for inmates to
> make sure that they have counsel for the § 3582 motion and that the

attorney handling the motion is going to be aggressive. If not, and if the inmate is able to do so, retain private counsel that follows the aggressive approach advocated by the attorneys at *Robinson & Brandt, P.S.C.*[9]

**What To Do**: The bottom line is that now is the time to take action. For defendants still within time to appeal or who are now on appeal, make sure your attorney is raising the amendments as grounds for a new sentence or a new sentencing hearing. For the defendants sentenced based upon crack cocaine and whose cases became final before November 1, 2007, now is the time to retain counsel to prepare and file an aggressive § 3582 motion and the equivalent of a sentencing memorandum.

**INTERESTED IN HIRING NLPA?**

If you're considering hiring someone to assist with your criminal proceedings, NLPA offers realistic fees that may suit you in your pursuit of finding topnotch yet affordable legal research & consulting assistance. We believe you will find our fees to be extremely competitive compared to other legal research firms in the country.

(Emphasis in original.)

Robinson's affidavit states that Whitmore again contacted NLPA on November 12, 2008, stating "he had received the appointment of a new attorney" and "he was going to determine if his new attorney would be willing to receive NLPA's assistance."  Robinson adds that on November 25, 2008, he and NLPA became aware of Magistrate Judge Homer's November 17, 2008 Order to Show Cause.  There were no subsequent communications between NLPA and Whitmore.

**King S. Burden**

*July 14, 2008 mailing*

According to Robinson's affidavit, Burden's mother Renda King contacted NLPA by telephone on July 11, 2008, stated that her son was charged in a conspiracy case in federal court, and asked "if NLPA's attorneys could work with and assist his attorney."  On July 14, 2008,

---

[9] According to its website, www.robinsonbrandt.com, *Robinson & Brandt, P.S.C.*, is located in Covington, Kentucky.  Its principals are Matthew M. Robinson and Jeffrey M. Brandt, both of whom are also listed on NLPA's website, www.nlpa.com as part of NLPA's "team."  Matthew M. Robinson is also a principal of Ratliff and Robinson, P.A., the firm that owns NLPA.

NLPA wrote Burden the same letter it sent to Whitmore on July 7, 2008, with the same enclosures (Summer 2008 Newsletter, "File Report" form to be completed by the defendant, financing documents, advertisement for "Surviving Jail," and "Victory List"), except that it omitted the "Our History" bulletin.

> ### July 25, 2008 mailing

On July 24, 2008, NLPA received $600 from Renda King along with a signed "Agreement for Services" agreeing to pay $2,500 for PPS.  On July 25, 2008, NLPA sent Burden a letter practically identical to the letter it wrote Whitmore on July 23, 2008, advising him that Mark Konerman had been assigned as his Case Manager.  Enclosed with the letter were financing documents and another advertisement for "Surviving Jail."

> ### August 4, 2008 mailing

On August 4, 2008, Konerman wrote his first letter to Burden.  The letter is set forth in its entirety:

> Dear King,
>
> I am writing to touch base with you on the status of your case.  Enclosed with this letter is a partial docket that reflects the court's most recent entries.
>
> As you know, at this point we are providing preliminary pretrial assistance as explained in our initial letter to you. We have yet to receive authorization from your attorney to have our attorneys assist him/her. If you have not done so, please speak with your attorney and give him permission to communicate with our office concerning providing assistance to him.
>
> In reviewing your file we note that you have been charged with possession with intent to distribute crack cocaine.
>
> I wanted to take this opportunity to forward some additional information that may be of assistance to you as your case progresses. Please review it

carefully as it may be of assistance to you when you speak with your attorney.

Once we receive your attorney's authorization to assist in this matter we will be able to shift our assistance to the Full Pretrial Assistance. However, if your attorney is unwilling to work with us, it is important for you to understand that you need to be addressing your issues with your attorney so he may provide the information to the court or file a motion to reconsider. We hope that this information is of help to you. We will be back in touch again soon and are looking forward to assisting you in this most important matter.

**"Knowledge is power.  Let NLPA's attorneys help keep you and your family up to date on what is happening in your case."**

Sincerely yours,

Mark E. Konerman
NLPA Case Manager

(Emphasis in original.)  According to the record submitted to Magistrate Judge Homer, the following were enclosed with the letter: an excerpted publicly-available docket sheet printed from the Northern District website[10]; an 11-page NLPA "Newsletter" headed "Crack Cocaine and the Need for a Strong Defense Team," dated Spring 2003; a 38-page (including appendices) publication from the Department of Justice titled, "Federal Cocaine Offenses: an Analysis of Crack and Powder Penalties" dated March 19, 2002; and a 2007 two-page "Memorandum" from NLPA to "All Interested Counsel and Their Clients" headed "Great News for Defendant! Sentencing Commission Finally Approves Beneficial Amendments to US Sentencing Guidelines for Crack Cocaine and Criminal History!"  This last memorandum included the following:

For those who are reading this information who have clients that will be sentenced before the effective date of these amendments, NLPA believes

---

[10] This docket sheet, dated December 2, 2008, post-dates the August 4, 2008, letter and thus cannot be a correct copy of the docket sheet that was enclosed with the letter.

that counsel may now use the amendments to attempt to obtain a reduced sentences by arguing (1) The guidelines are not mandatory; (2) The sentencing commission had acknowledged through the amendments that the current guidelines produce sentences that are too high; (3) Accordingly, the judge should follow the effect of the new amendments now. Alternatively, counsel may argue that the sentencing date for a defendant who could benefit from these new guidelines should be delayed until after November 1, 2007 so that the defendant can receive the appropriate sentence.

*August 12, 2008 mailing*

On August 12, 2008, Konerman wrote to Burden.  The letter included the following:

> As you have indicated that you have questions about pretrial release, I wanted to send you this letter and some additional information that you may find of interest.
>
> In many situations once an individual is arrested, he or she believe that he or she will be arraigned and a bail will be set so they may be released.  The alleged accused believes that bail will be automatically authorized.  Unfortunately, more often than not, this is not the case.  Many times the alleged accused is advised that the court believes they are a "flight risk" or is a danger to the community.  Since this happens usually within a few days of arrest, the accused and his or her counsel have little time to prepare to refute the allegations made by the government as to why the accused should remain in custody.  In addition, many individuals do not understand the criteria by which the Court makes this determination.
>
> The Bail Reform Act of 1984 authorizes and sets forth the procedures for a judicial officer to order the release or detention of an arrested person pending trial, sentencing or appeal.  Enclosed with this letter is a copy of "The Bail Reform Act of 1984."
>
> If you have an upcoming hearing concerning your release pending trial or have been denied release pending trial, it is important for you to review the enclosed and speak to your attorney about any information that you believe that the court should consider that would support that you should be released pending trial, and the reasons for the denial and their validity to determine how to proceed in preparing your attack on these claims.  Any reasons that are presented by the government that you feel are inaccurate should be discussed and supporting documentation or information provided to your attorney.  It is important to understand that you do have options.
> ***

In addition, I am enclosing a Checklist that outlines the basic information considered by the Court.  If you believe that you do meet the criteria for pretrial release, I would appreciate if you could review this information and write to us and your counsel outlining in detail the reasons you believe you should receive pretrial release.
***
We hope that this information is of help to you. We will be back in touch again soon and are looking forward to assisting you in this most important matter.

**"Knowledge is power.  Let NLPA's attorneys help keep you and your family up to date on what is happening in your case."**

(Emphasis in original.)  According to the record submitted to Magistrate Judge Homer, the following were enclosed with the letter: a publicly-available docket sheet printed from the Northern District website[11]; a 77-page 1993 article, "Bail Reform Act of 1984," by the Federal Judicial Center; and a four-page "Pretrial Release, Bond and Bail Checklist" dated December 16, 2004, printed from the website of the Judicial Education Center of the University of New Mexico School of Law.

In his affidavit, Robinson stated that James E. Long, Esq., Burden's assigned defense counsel, told Robinson he would be willing to receive NLPA's research assistance.  Robinson wrote to Long on August 20, 2008, stating: "As we discussed, your client is interested in having our lawyers see if we can come up with any type of motion to request reconsideration of his bond status."  According to Robinson, Long never requested specific research from NLPA, and on October 15, 2008, Burden advised NLPA that he had decided to request the appointment of new counsel.  On November 25, 2008, NLPA learned of Magistrate Judge Homer's November 17, 2008 Order to Show Cause.  There were no subsequent communications between NLPA and

---

[11] This docket sheet, dated December 2, 2008, post-dates the August 12, 2008 letter and thus cannot be a correct copy of the docket sheet that was enclosed with the letter.

-22-

Burden.

## DISCUSSION

**Applicable law**

It is undisputed that NLPA is not authorized to practice law in the Northern District of New York. The issue before the Court is whether NLPA did practice law here in its interactions with Whitmore and Burden. The Court adopts Magistrate Judge Homer's summary of the applicable law. As Magistrate Judge Homer notes, "[t]he orderly functioning of our judicial system and the protection of our citizens require that legal advice should be offered only by those who possess the requisite qualifications and authorization for the practice of law." *Dacey v. New York Co. Lawyers' Ass'n*, 423 F.2d 188, 189 (2d Cir. 1969). Courts possess the inherent power to control admission to the bar and to discipline attorneys who appear before them. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). Such power extends to enjoining and sanctioning the unauthorized practice of law. *See United States v. Johnson*, 327 F.3d 554, 560 (7th Cir. 2003). Rules for admission to the practice of law, rules regulating the conduct of the bar, and laws against the unauthorized practice of law were enacted "to protect the public from ignorance, inexperience and unscrupulousness." *People v. Alfani*, 227 N.Y. 334, 339 (1919).[12]

In considering what constitutes the practice of law, New York's high court observed:

> There are certain fundamental requirements and features which, according to our conception, in this state attend and surround the practice of law and rendition of truly legal services. These are the possession of sufficient

---

[12] Northern District of New York Local Rule 83.4(j) provides:

The Court shall enforce the N.Y.S. Lawyer's Code of Professional Responsibilities, as adopted from time to time by the Appellate Division of the State of New York, in construing which the court as a matter of comity will follow decisions of the New York State Court of Appeals and other New York state courts absent an over-arching federal interest and as interpreted and applied by the United States Court of Appeals for the Second Circuit.

> knowledge and skill, the existence of a relationship of trust and confidence
> upon which the client may securely rely, and the power of courts to use
> summary proceeding, if necessary, to enforce on the part of the attorney
> observance of the obligations and duties growing out of this relationship.

*People v. Title Guarantee & Trust Co.*, 227 N.Y. 366, 372 (1919).  It has long been the law in

New York that the practice of law includes giving legal advice as well as appearing in court and

holding oneself out to be a lawyer.  *See El Gemayel v. Seaman*, 72 N.Y.2d 701, 706 (1988);

*Spivak v. Sachs*, 16 N.Y.2d 163, 166(1965); *Alfani*, 227 N.Y. at 337-38; *see also Spanos v.

Skouras Theatres Corp.*, 364 F.2d 161, 165 (2d Cir. 1966).  More specifically, the practice of law

includes "the rendering of legal advice and opinions directed to particular clients."  *Matter of

Rowe*, 80 N.Y.2d 336, 341-42 (1992).  In *Rowe*, New York's high court held that publishing an

article in the "Journal of Urban Psychiatry" on the legal rights of psychiatric patients who refuse

treatment did not constitute the practice of law.  The court observed: "Respondent's article sought

only to present the state of the law to any reader interested in the subject.  Inasmuch as it neither

rendered advice to a particular person nor was intended to respond to known needs and

circumstances of a larger group, its publication did not constitute the practice of law."  *Id.* at 342.

Similarly, New York has held that authoring a book, "How to Avoid Probate," which was sold to

the public at large, did not constitute the practice of law, on the ground that:

> There is no personal contact or relationship with a particular individual.
> Nor does there exist that relation of confidence and trust so necessary to the
> status of attorney and client. This is the essential of legal practice -- the
> representation and the advising of a particular person in a particular
> situation.

*Matter of New York County Lawyers Association v. Dacey*, 283 N.Y.S.2d 984, 998 (1st Dep't

1967) (Stevens, J., dissenting), *aff'd on the dissenting opinion*, 21 N.Y.2d 694 (1967); *accord

State v. Winder*, 348 N.Y.S.2d 270 (4th Dep't 1973) (layperson's sale of "Divorce Yourself Kit"

-24-

was not practice of law, but giving "legal advice in the course of personal contacts concerning particular problems which might arise in the preparation and presentation of the purchaser's asserted matrimonial cause of action or pursuit of other legal remedies and assistance in the preparation of necessary documents" was practice of law); *see generally In re Gaftick*, 333 B.R. 177, 188 (Bankr.E.D.N.Y. 2005); *In re Herren*, 138 B.R. 989, 995-96 (Bankr.D.Wyoming 1992).

NLPA contends it did not practice law in Whitmore's and Burden's cases because it did not give "case-specific" advice.  "Case-specific" is not a term used in applicable case law. Rather, the question, as articulated in *Rowe* and *Dacey*, is whether NLPA rendered legal advice directed to each defendant regarding his particular situation.  As set forth below, the Court finds that it did.

**The evidence**

### *First mailings*

In reviewing the evidence supporting its conclusion that NLPA engaged in the practice of law in its relations with defendants, the Court begins with the promotional materials sent by NLPA in its first mailings to Whitmore and Burden, on July 7, 2008 and July 14, 2008, respectively.  These materials comprised a cover letter to each defendant and a number of enclosures, including a NLPA Newsletter dated Summer 2008 headed "Pre-trial and the Need for a Strong Defense Team" ("Summer 2008 Newsletter") and an NLPA memorandum headed "Victory List."  In these materials, NLPA held itself out as a company "owned and staffed by licensed attorneys" and having unique legal expertise that could greatly enhance a criminal defendant's defense.  For example, in the Summer 2008 Newsletter, NLPA stated: "Through our involvement in literally thousands of cases, coupled with our national professional staff, NLPA

has developed an unique and unmatched expertise in pretrial, trial, sentencing, appellate, and post

conviction matters."  There are numerous similar examples.[13]  Also, the enclosed NLPA "Victory

---

13

In Whitmore's case and on its website, in support of its claim to possess uniquely valuable legal knowledge, NLPA relied in part on the criminal history of its founder, former attorney H. Wesley Robinson.  The "Our History" bulletin enclosed in the first mailing to Whitmore includes the following:

> After practicing law and then working in the field of investment banking, Mr. Robinson was prosecuted by federal authorities! He and his family were shocked and amazed about the workings of the federal justice system and learned first hand what it feels like to be up against the awesome power of the government. He also learned first-hand what it was like to trust his defense attorneys, only to have them turn their back on him after the convictions were handed down despite the fact they had been paid large retainer fees. In the end, Mr. Robinson was forced to serve time in federal prison. While "down," Mr. Robinson was able to research his case, discovering the countless mistakes that were made by his former attorneys. He worked for three years trying to correct these mistakes and ultimately gained an early release from prison.
>
> It was upon Mr. Robinson's release that NLPA was formed. His personal experience with the justice system taught him that a defense attorney alone is often no match for the unlimited resources and powers of the federal government. He also learned first-hand how important it is to maintain communication with the most busy of attorneys and keep informed about their case. *From this experience, NLPA was created with the goal of providing defense attorneys and their clients with a source of high quality and aggressive research assistance at all phases of the criminal justice process.*  Mr. Robinson believed that by providing the defense with a team of research attorneys and paralegals to assist defense counsel, the playing field would become more even, giving the defense a fighting chance against the vast resources of the government.
> ***
> Mr. Robinson no longer is the director for NLPA. However, we continue to engage him as a management consultant. Who better to rely on for advice than someone who is knowledgeable from first hand experience?
> ***
> *Remember: We are here to help in these most challenging of times as we know what it feels like to be wrongfully accused.*
> WE LISTEN, WE CARE, WE GET RESULTS!

This bulletin is also featured on NLPA's website, cited in the initial mailings to Whitmore and Burden.

Robinson's criminal and disciplinary history, insofar as it can be found on Westlaw.com, is as follows.  On July 18, 1979, Ohio's high court indefinitely suspended him from the practice of law. *Columbus Bar Assn. v. Robinson,* 391 N.E.2d 1019 (Ohio 1979).  On January 24, 1984, Robinson was convicted upon a guilty plea in the Southern District of Ohio of four counts of mail fraud and one count of wire fraud.  *See United States v. Robinson*, 774 F.2d 261, 265, 268, 273-74 (8th Cir. 1985) (discussing Robinson's Ohio conviction).  On July 13, 1984, he was convicted after a jury trial in the Southern District of Iowa of fifteen counts of mail fraud; the conviction was upheld on appeal.  *Id.* at 274.  Based on this criminal and disciplinary history, Ohio's high court permanently disbarred him from the practice of law in 1985.  *Columbus Bar Ass'n v. Robinson*, 480 N.E.2d 469, 470 (Ohio 1985).  Finally, in 2003, the Seventh Circuit affirmed the Southern District of Illinois' determination that Robinson and NLPA had engaged in the unauthorized practice of law.  *United States v. Johnson*, 327 F.3d 554 (7th Cir. 2003) (upholding remedial sanctions but reversing punitive sanctions).

List" memorandum stated: "The following is a list of just some of the cases in which NLPA has

provided research and assistance to counsel as a member of the *Defense Team*. With the help of

NLPA's experienced team of investigators, paralegals, and attorneys, the cases listed below all

resulted in a <u>victory</u> for the defendant."  (Emphasis in original.) Attached was a list of over 200

cases, mostly federal, with index numbers ranging from 1990 to the late 2000's.

    Besides describing NLPA's unique legal expertise, these materials offered to enter into a

relationship of trust and confidence with each defendant.  In the first letter, NLPA proposed to

"serve a supporting role to enhance communication" during the PPS stage and to keep each

defendant and his family advised "as to what is happening in [his] case and liaison with

[defendant and his family] on many very important aspects of [his] defense." The enclosed

Summer 2008 Newsletter offered in the PPS stage to "follow[] up with the court to advise

[defendants and their families] of what pre-trial motions have been filed, responses filed by the

government, and the status of the case in general" and to assist defendants and their families "in

getting a clearer understanding of exactly what is happening with the case." The Summer 2008

Newsletter also included the following:

> Many times, defendants and their families have a difficult time in
> understanding what is happening to them. Unfortunately, they often find
> that their attorney is too busy to keep clear communication lines with them.
> The defendants sometimes simply do not know what has been filed and
> when court hearings are scheduled. We know that sometimes defendants
> and family members call their attorneys trying to get information about
> what is happening only to be told that their attorney is unavailable.  Some
> times attorneys do not take defendant's collect calls. This type of frustrating
> experience can be avoided by retaining NLPA to assist you. When you
> retain NLPA, you will be assigned a case manager on our staff who will be
> available at all times to keep you informed as to exactly what is happening
> with your case. Once we are hired, we will take your collect calls to speak
> directly with you.  **This process not only helps you – the client – but
> assists your counsel as well.**

> ***
> You are important to us and we hope we can commence and maintain a
> long-term relationship with you.  Please know that we are here to assist in
> all your needs.

(Emphasis in original.)  NLPA also sent a "File Report" form with the first letter requesting each

defendant to write a letter "explaining about issues in your case that you want us to be aware of";

to provide  information regarding his present offense; and to write a "Statement of Events (**attach**

**detailed memorandum** if possible)."  (Emphasis added.)  Thus, in proposing to enter into a PPS

relationship with defendants, NLPA requested potentially confidential information from them

regarding their cases and offered to perform services ordinarily performed by defense counsel, to

compensate for defense counsel's shortcomings, and, in essence, to insert itself into heart of the

relationship between defendant and counsel by acting as an advisor to defendant and an assistant

to his attorney.  As such, NLPA offered to serve as a legal advisor upon which defendants could

rely.

*Second mailing*

Once NLPA received payments from defendants' families, it sent a second packet of

materials to Whitmore on July 23, 2008, and to Burden on July 25, 2008.  These mailings

included practically identical letters from NLPA acknowledging receipt of partial PPS payments

and introducing Konerman as case manager.  The letters indicated that NLPA would perform

original legal research for defendants during PPS.  In particular, the second letter from NLPA to

each defendant referred to PPS payments as "NLPA's research fee," and described the case

manager as "your main contact at NLPA, acting as a connection **between you, as the client, and**

**the NLPA's research staff**."[14]  (Emphasis added.)  The letter further stated as follows:

> Regarding communication with our office, while we are happy to hear from you on the telephone, I want to emphasize that if there is detailed information that you desire to provide to us or if you have complex issues that need to be addressed, please write to us about this material. Remember, your case manager is not an attorney and cannot answer specific legal questions concerning your case. However, in order to get a full understanding of your case, we want your input! We realize that you know your case better than anyone because YOU LIVED IT! Therefore, **if you want specific legal issues addressed in your research, it is very important that this information be "in writing" in our files.  If you have not provided this information in writing, it will be impossible for the research staff to address your thoughts concerning your case in our research**. Therefore, help us help you! If you want NLPA to address certain issues or questions, you must write it down in a letter and send it to your case manager.

(Emphasis added; original emphasis removed.)  NLPA's promotional materials repeatedly emphasized that NLPA research was performed by attorneys.[15]  According to the second letter, then, during the PPS stage, NLPA's research staff – that is, its lawyers – would perform original legal research at each defendant's request addressing specific issues arising in his case.

*Subsequent mailings*

Having entered into the PPS relationship and introduced Konerman in the second mailings, NLPA began providing PPS services.  Konerman sent two packets of legal materials to each defendant: to Whitmore on July 31, 2008 and August 27, 2008, and to Burden on August 4, 2008 and August 12, 2008.  In these mailings, Konerman sent each defendant copies of his docket sheet and mailed him articles and other materials pertinent to what NLPA knew about his

---

[14] Read in context, the description pertains to PPS as well as FPS.

[15] For example, the Summer 2008 Newsletter stated: "Our research is prepared by licensed attorneys."

particular situation and in response to his questions.[16]  In addition, NLPA sent Whitmore an

NLPA memorandum on September 11, 2008.

Most of the materials Konerman sent were either memoranda from NLPA or articles

written by lawyers who had no apparent connection to NLPA.  Most either purported to explain

the law applicable to a certain issue, such as pretrial release, or recommended specific defense

tactics, such as placing certain language in a plea agreement.  All addressed a particular topic in

general or hypothetical terms.  The articles dated as far back as 1993 and included several items

on sentencing that predated *United States v. Booker*, 543 U.S. 220 (2005).[17]

The materials NLPA sent Whitmore included two letters from Konerman with extensive

enclosures, apparently sent in response to Whitmore's questions.  In the first letter, dated July 31,

2008, Konerman noted: "[Y]ou have communicated with our office that you cannot decide

whether to enter a plea in your case or take your case to trial" and stated: "We wanted to take this

opportunity to send you some information that may be of assistance to you concerning plea

negotiations."  Enclosed were articles on plea and sentencing issues, including articles by public

defenders and an assistant United States attorney about federal plea agreements, and three

undated NLPA memoranda with the following headings: "How to Avoid the Use of Dismissed

---

16

Konerman's letters to both defendants gave the appearance of having been sent under the supervision of
NLPA's lawyers.  They bore NLPA letterheads and were signed by Konerman as "NLPA Case Manager."
At the foot of the letters – in each of which Konerman said he was "touch[ing] base with [defendant] on
the status of [his] case" or "follow[ing] up" to provide "additional information concerning [his] case" – the
following appeared in bold font: "Let **NLPA's attorneys** help keep you and your family up to date on
what is happening in your case."  (Emphasis added.)

17

As the Second Circuit observed: "The entire landscape of federal sentencing changed on January 12, 2005,
with the Supreme Court's decision in *United States v. Booker*[.]" *United States v. Rogue*, 421 F.3d 118 (2d
Cir. 2005).

Charges from an Indictment in Determining Your Client's Sentence"; "Techniques for Enforcing Stipulations in Plea Agreements at Sentencing – Another NLPA Victory!"; and "Remedies Available to Defendants Who Have Waived Their Appellate or § 2255 Post Conviction Rights in a Plea Agreement."  It does not appear that NLPA sent any of these items to Burden.

The first-listed of these three NLPA memoranda, headed, "How to Avoid the Use of Dismissed Charges from an Indictment in Determining Your Client's Sentence," included the following:

> We are oftentimes contacted by inmates and counsel inquiring as to how during the course of plea negotiations the plea agreement can be structured in such a way as to avoid the use of dismissed charges in determining the defendant's relevant conduct and, hence, his sentencing guideline score. This is a very **critical factor to take into consideration when negotiating a plea agreement on behalf of a defendant**.... [U]nless the appropriate language is placed into the plea agreement, at the time of sentencing the government oftentimes is successful in using the criminal activity involved in dismissed counts in determining the relevant conduct of the defendant and, hence, his sentence.
> ***
> Accordingly, **defendants who plead guilty should make sure that the plea agreement contains specific language** as to the "relevant conduct" that will be considered for sentencing.  With the "relevant conduct" stipulation, a defendant can make sure that he gets sentenced based upon that conduct to which he has pled guilty.  Failure of counsel to so stipulate in the plea agreement may result in the conduct set forth in the dismissed counts being used for sentencing purposes which, of course, will result in the defendant receiving a much longer sentence than he would otherwise have received.
> ***

(Emphasis added; original emphasis removed.)  Thus, upon learning that Whitmore was considering a guilty plea, Konerman sent a memorandum authored by NLPA recommending that his defense attorney place specific language in the plea agreement and that defendant "make sure" it is done.  Plainly, the letter and enclosed article advised Whitmore about the law pertaining to

his particular situation and recommended a certain course of action.

Konerman's second letter to Whitmore, dated August 27, 2008, stated: "In recent communications, you indicated that you may be considering entering into plea negotiations and are concerned about your prior criminal history and how it may impact your current offense.  We are enclosing some information that you may find of interest."  Among the enclosed legal articles and NLPA memoranda was a 21-page article written by two assistant public defenders in 2004, entitled "Beating the Rap (Sheet): Fighting Sentencing Enhancements Based on Prior Convictions."  By sending this particular article, written by public defenders, on how a specific issue in Whitmore's case should be handled, NLPA advised him about the law pertaining to his particular situation.

Finally, on September 11, 2008, NLPA sent Whitman an NLPA newsletter headed: "Great News for Crack Case Defendants and Their Families: New Sentencing Guidelines Go into Effect. BOP Projects 20,000 Defendants Eligible for Early Release!" discussing *Kimbrough v. United States* 552 U.S. 85 (2007), thus advising Whitmore about the law.

As for Burden, Konerman's first letter, dated August 4, 2008, stated: "In reviewing your file we note that you have been charged with possession with intent to distribute crack cocaine." Konerman added that he was forwarding "some additional information that may be of assistance to you as your case progresses" and enclosed an NLPA Newsletter headed "Crack Cocaine and the Need for a Strong Defense Team"; an NLPA memorandum addressed to "Interested Counsel and Their Clients," regarding amendments to the Sentencing Guidelines for crack cocaine; and a Department of Justice publication analyzing federal crack and powder cocaine penalties.  The NLPA memorandum regarding amendments to the Sentencing Guidelines for crack cocaine

included a paragraph setting forth the arguments defense counsel could make to obtain a reduced

sentence based on the amendments.  It does not appear that NLPA sent any of these articles to

Whitmore.

On August 12, 2008, Konerman sent Burden a letter and enclosures in response to a

telephone call from Burden.  After noting that Burden had "indicated that [he] ha[d] questions

about pretrial release" Konerman wrote:

> The Bail Reform Act of 1984 authorizes and sets forth the procedures for a
> judicial officer to order the release or detention of an arrested person
> pending trial, sentencing or appeal.  Enclosed with this letter is a copy of
> *The Bail Reform Act of 1984*.
>
> If you have an upcoming hearing concerning your release pending trial or
> have been denied release pending trial, **it is important for you to review
> the enclosed and speak to your attorney about any information that
> you believe that the court should consider** that would support that you
> should be released pending trial, and the reasons for the denial and their
> validity to determine how to proceed in preparing your attack on these
> claims.  **Any reasons that are presented by the government that you
> feel are inaccurate should be discussed and supporting documentation
> or information provided to your attorney**.  It is important to understand
> that you do have options.
> ***
> In addition, I am enclosing a **Checklist that outlines the basic
> information considered by the Court**.  If you believe that you do meet
> the criteria for pretrial release, I would appreciate if you could review this
> information and **write to us and your counsel outlining in detail the
> reasons you believe you should receive pretrial release**.

(Emphasis added.)  The Bail Reform Act article, by the Federal Judicial Center, includes

discussion of the statutory grounds for pretrial detention, the factors considered by the court, and

the types of admissible evidence.  The Pretrial Release, Bond and Bail Checklist, printed from the

website of the Judicial Education Center of the University of New Mexico School of Law, lists

factors to be considered, release options, and possible conditions of release.  By sending Burden

these particular articles in response to his question and stating that the Checklist "outlines the

basic information considered by the Court," NLPA advised Burden about the law pertaining to his

particular situation.  And by telling him it was "important" for him to review the articles and

speak to his attorney about specific matters, NLPA interceded in the relationship between

defendant and his defense counsel.

### *Defendants' statements to Magistrate Judge Homer*

As noted, NLPA's promotional materials indicated that its lawyers would perform legal

research for defendants during PPS.  NLPA's materials also repeatedly stated that NLPA could

not represent defendants and that defendants needed their own lawyers to represent them.  To the

extent that NLPA contends that legal research on issues arising in each defendant's particular

case was limited to the FPS stage, such a limitation was not clear in the materials. To the

contrary, both defendants believed that the PPS services they received were provided in part by

NLPA's lawyers.  In the hearing before Magistrate Judge Homer, Whitmore stated:

> THE DEFENDANT: Been doing my legal studies in the library and my
> mother also hired like a legal team, but they can't represent me though.
> Information I got from the law library and legal team just don't add up to
> what Mr. Austin (inaudible)...
> THE COURT: When you say a legal team, are you talking about lawyers?
> THE DEFENDANT: It's like a team of lawyers, but they can't represent
> you. Something called NLPA. National Legal Professional Associates.
> ***
> THE DEFENDANT: The legal team themself sent me package, legal stuff
> to read, and I believe they call the law library in jail, and I feel a few
> helpful things from books that I'm reading, packages that they sent me, and
> um...
> THE COURT: Can you give me an example?
> THE DEFENDANT: Might be – not off the top.  I'm trying to think of
> (inaudible) . Might be talking about on the rap sheet, how to beat your
> client's rap sheet.  I really – I can't pinpoint things right now. (inaudible)

> Legal material with me though. How to beat your client rap sheet.[18]  And
> Mr. Austin, he might say something different, the papers might tell me
> something different right now, things of that nature.
> *** [Redacted] ***
> THE DEFENDANT: I feel there's a mistake on my – I feel a mistake on
> my rap sheet that say I have two felony when I should have one.  Things
> I'm reading from the law library and NLPA also saying things that I feel,
> Mr. Austin is saying that this is the reason why.
> ***
> THE COURT: Do you know if they're lawyers?
> THE DEFENDANT: They have their own senior lawyers but they use like
> a – I don't know how to pronounce it. They work as your lawyer but like
> they – I'm not sure Mr. Austin got in contact with them, but they was able
> to work aside of him. (inaudible) I know put aside working, finding out
> things, he ain't one to do that. So basically they work with me and my
> family. But they have also their own lawyers that I have to hire myself.

Although Whitmore understood that NLPA could not "represent" him, he viewed its mailings as

information sent by the "legal team" about the law applicable to his particular situation.

Similarly, Burden described NLPA to Magistrate Judge Homer as "a group of lawyers and

associates that sent me all kind of paperwork and stuff and just make sure my lawyer is doing his

job."  When asked if NLPA gave him legal advice, Burden answered "Yes," then, after a pause,

stated: "Nothing nothing really concerning my case just, um what kind of motion I could file or –

basically I asked them a question, and then they send me that package from what I asked.... I

asked them a question that I would have asked my lawyer if I was able to contact him over the

phone."

**Analysis**

      Based on the above, the Court finds that NLPA engaged in the practice of law in its

---

18 Presumably this was the article entitled "Beating the Rap (Sheet): Fighting Sentencing
Enhancements Based on Prior Convictions" sent by Konerman in his August 27, 2008 mailing to
Whitmore in response to Whitmore's communication that he was considering entering into plea
negotiations and was concerned about the impact of his prior criminal history.

relationships with defendants.  NLPA held itself out as an expert in criminal defense law, entered into a relationship of trust and confidence with each defendant, obtained information from him about his particular case, mailed him letters and legal materials purporting to contain reliable information about the law applicable to specific aspects of his particular situation or responding to his questions, and charged a substantial fee for doing so.  The nature of the services provided by NLPA were those of a legal advisor upon whose information and recommendations each defendant could rely in his particular case.  It is immaterial whether the materials were sent by a lawyer or by a case manager; in the circumstances, they bore the *imprimatur* of having been selected and approved by a lawyer or under a lawyer's supervision.  It is also immaterial that (with the possible exception of Konerman's letters) the mailings comprised already-existing materials, not original research prepared for each defendant; NLPA in its role as legal advisor selected and sent different materials to each defendant for the purpose of providing him with reliable information about the law applying to aspects of his particular situation and, in some instances, recommending certain actions.  As such, the mailings constituted "legal advice and opinions directed to particular clients[,]" and did not simply "present the state of the law to any reader interested in the subject." *Rowe*, 80 N.Y.2d at 341-42.

It is true that a layperson might have found the same articles on the internet and mailed them to defendants.  It is unlikely, however, that defendants would have relied on the articles as containing legal advice about their particular cases – or that their families would have agreed to pay $2,500 – were it not for NLPA's representations about its legal expertise and the nature of its services.  Each defendant here reasonably viewed NLPA's mailings as advice from NLPA's lawyers about the law pertaining to his particular situation.  Indeed, each relied on the advice to

-36-

such an extent that he no longer trusted the advice given by his own lawyer.

In considering the implications of NLPA's conduct, the Court notes that the materials frequently interfered in the relationship between defendants and defense counsel.  For example, the materials included recommendations as to how defense counsel should handle certain legal matters; in fact, Burden viewed NLPA's role as "mak[ing] sure his lawyer was doing his job."[19] NLPA went so far as to suggest that defense lawyers who refused to use NLPA's services should be replaced; the Summer 2008 Newsletter included in the initial mailings stated: "[I]f you want our assistance and ... your attorney declines to work with NLPA, **you will need to engage an attorney who values NLPA's services**." (Emphasis added.)  As a result of NLPA's mailings, both defendants requested and obtained new counsel, although Magistrate Judge Homer stated in both cases that defendants already had excellent representation.  The expense and delay involved in the substitution of counsel creates a burden on the orderly functioning of the judicial system, particularly regarding the courts' control of their calendars and the provision of assigned counsel and public defender services.

Even more importantly, NLPA's interference in the defense of defendants' cases raises serious issues regarding the protection of defendants' interests.  In its guise as a provider of services that do not constitute the practice of law, NLPA has evaded supervision by the bar associations and courts and avoided the strictures imposed by the New York Rules of Professional

---

[19] Also, the "Our History" bulletin mailed to Whitmore with the first letter and posted on NLPA's website asserted that  Robinson's defense attorneys "turn[ed] their back on him after the convictions were handed down" and that Robinson "discover[ed] countless mistakes that were made by his former attorneys."

Conduct.[20]  Of particular concern are the lack of supervision of fee arrangements,[21] the absence of protection against conflicts of interest in simultaneous representation of multiple clients,[22] and the inapplicability of the attorney-client privilege to information given to NLPA by defendants.[23]

The Court notes also that due to NLPA's out-of-state location, defendants and their families would likely have no practical recourse in the event of a fee dispute or other claim against NLPA or its staff.  *See, e.g., Douglas v. Ratliff*, 2009 WL 3378672, *12-*13 (S.D.Ohio Oct. 20, 2009) (breach of contract claim in action against NLPA staff by Virginia inmate, his mother, and his uncle dismissed on various grounds including failure to satisfy $75,000 amount-in-controversy requirement for federal diversity jurisdiction under 28 U.S.C. § 1332(a)); *Brown v. Robinson*, 2009 WL 1313364 (S.D.Ohio May 8, 2009) (breach of contract action against NLPA staff by Florida inmate dismissed on same ground).

---

[20] When NLPA rendered its services to defendants here, the conduct of attorneys in New York State was governed by the Code of Professional Responsibility. That code has now been replaced, effective April 1, 2009, by the New York Rules of Professional Conduct.  For purposes of this decision, the changes are irrelevant.

[21] *See* New York Rules of Professional Conduct 1.5, formerly DR 2-106.  As noted, NLPA charged a flat non-refundable fee of $2,500 (or $2,750) for PPS.  As a general rule, nonrefundable retainer fee agreements "clash with public policy and transgress provisions of the Code of Professional Responsibility... essentially because these fee agreements compromise the client's absolute right to terminate the unique fiduciary attorney-client relationship.  *Matter of Cooperman*, 83 N.Y.2d 465, 471-72 (1994) (cited in *In re Hayes*, 183 F.3d 162, 170 (2d Cir. 1999).

[22] *See* New York Rules of Professional Conduct 1.7, formerly DR 5-105.  Here, NLPA obtained information from and gave advice to both Whitmore and Burden, codefendants charged with conspiracy in the same criminal complaint.

[23] Such information could be significant and damaging. For example, as noted, the "File Report" form included in the initial mailings requested each defendant to provide substantial information, including information regarding his present offense, a detailed narrative statement of events, and a letter "explaining issues in [his] case that [he] wants [NLPA] to be aware of."  And in his August 12, 2008 letter, Konerman asked Burden to write to NLPA and his attorney explaining "in detail the reasons [he] believe[s] [he] should receive pretrial release."

In the exercise of its inherent powers, *see Chambers v. NASCO, Inc*., 501 U.S. 32, 43 (1991), the Court holds that, in its relationship with Whitmore and Burden in *United States v. Whitmore*, Case No. 1:08-CR-385, NLPA engaged in the unauthorized practice of law.  The Court issues an injunction and a refund order.  The injunction order applies to NLPA, its representatives, and all individuals associated therewith, including but not limited to the following people, whose names appear in the record and/or on NLPA's website, www.nlpa.com: H. Wesley Robinson, Matthew M. Robinson, Robert A. Ratliff, Thomas Gaugh, Margaret Robinson, Darren Mullaney, Ronan Ragiel, Susan Troutt, Stephanie Shortt, Pam Grimm, Mark Konerman, Kelly Crull, Karen Cornell, Sue Kroger, Ken Ragiel, and Jeffrey M. Brandt.

## CONCLUSION

It is therefore

ORDERED that NLPA's motion (Dkt. No. 7) to unseal transcripts of the September 29, 2008, and November 7, 2008, hearings is denied as moot; and it is further

ORDERED that the Report and Recommendation (Dkt. No. 21) is rejected; and it is further

ORDERED that NLPA, its representatives, and all individuals associated therewith are hereby enjoined from engaging in the unauthorized practice of law in the Northern District of New York, and it is further

ORDERED that the injunction applies to NLPA, its representatives, and all individuals associated therewith, including but not limited to the following: H. Wesley Robinson, Matthew M. Robinson, Robert A. Ratliff, Thomas Gaugh, Margaret Robinson, Darren Mullaney, Ronan Ragiel, Susan Troutt, Stephanie Shortt, Pam Grimm, Mark Konerman, Kelly Crull, Karen

Cornell, Sue Kroger, Ken Ragiel, and Jeffrey M. Brandt; and it is further

ORDERED that within 30 days of the date of this Memorandum-Decision and Order, NLPA shall give notice of the injunction to its representatives and all individuals associated therewith, including all individuals listed in the preceding ordering paragraph, and shall file an affidavit sworn under penalty of perjury by a representative of NLPA having first-hand knowledge of the facts set forth therein, setting forth the notice provided and listing all individuals notified; and it is further

ORDERED that within 30 days of the date of this Memorandum-Decision and Order, NLPA shall refund all fees paid on behalf of Cash Whitmore and King S. Burden, defendants in *United States v. Whitmore*, Case No. 1:08-CR-385; and it is further

ORDERED that within 30 days of this Memorandum-Decision and Order, NLPA shall file an affidavit sworn under penalty of perjury by a representative of NLPA having first-hand knowledge of the facts set forth therein, and containing non-conclusory factual detail (1) disclosing all payments NLPA received in these two matters, and (2) demonstrating that all such payments have been refunded; and it is further

ORDERED that the Clerk of the Court shall provide a copy of the Memorandum-Decision and Order herein by mail or electronically to the following: Cash Whitmore, defendant in *United States v. Whitmore*, Case No. 1:08-CR-385; Whitmore's lawyer in that case, Brian W. Devane, Esq., 636 Delaware Avenue, Delmar, New York 12054; King S. Burden, defendant in *United States v. Whitmore*, Case No. 1:08-CR-385; Burden's lawyer in that case, Paul A. Clyne, Esq., 61 Columbia Street, Suite 401, Albany, New York 12210 ; Office of the Federal Public Defender, 39 North Pearl Street, 5th Floor, Albany, New York 12207; the New York State Attorney General,

The Capital, Albany, New York 12224; Onondaga County Bar Association, 109 South Warren

Street, Syracuse, New York 13202-1860; New York State Bar Association, One Elk Street,

Albany, New York 12207; Committee on Professional Standards, Third Judicial Department, 40

Steuben Street, Albany, New York 12207-2109; Attorney Grievance Committee, Fifth Judicial

District, 224 Harrison Street, Suite 408, Syracuse, New York 13202-3066; and Attorney

Grievance Committee, Seventh Judicial District, 50 East Avenue, Suite 404, Rochester, New

York 14604-2206; and all attorneys on the Northern District C.J.A. assigned counsel list.

IT IS SO ORDERED.

February 18, 2010
Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge

-41-